

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-18-00310-CV

———————————————

IN THE INTEREST OF S.B., T.B., A.B., AND K.B., CHILDREN

On Appeal from the 211th District Court
Denton County, Texas
Trial Court No. 15-03884-211

Before Pittman, J.; Sudderth, C.J.; and Gabriel, J.
Per Curiam Memorandum Opinion

## MEMORANDUM OPINION

After a bench trial in 2018, the trial court terminated the parent–child relationships of Henry Baker (Father) and Appellant Kathryn Baker (Mother) with their children, Susan, Asa, Timothy, and Kellie.[1] Only Mother appealed. In three issues, she challenges the legal and factual sufficiency of the evidence supporting the endangerment and best-interest findings against her and contends that her trial counsel (Trial Counsel) provided ineffective assistance of counsel at trial. Because we hold that the evidence is sufficient to support the termination of Mother's parental rights and that she did not satisfy her burden to prove ineffective assistance of Trial Counsel, we affirm the trial court's judgment (2018 Decree).

## BACKGROUND FACTS

### I. The Family Had an Extensive History with the Texas Department of Family and Protective Services (TDFPS) Before the Children's First Removal in 2015.

Mother and Father married young and had Susan in 2007, twins Asa and Timothy in 2011, and Kellie in early 2013. Before the children's first removal in 2015 (the 2015 removal), TDFPS investigated the following:

---

[1]In this opinion, we use aliases to refer to the children, their parents, their maternal grandmother, and their mother's fiancé. *See* Tex. R. App. P. 9.8(b)(2) (requiring courts to use aliases to refer to minors in parental-rights termination cases and, if necessary to protect the minors' identities, to also use aliases to refer to their family members).

- a 2011 referral based on concerns for Mother's mental health and Father's drug use;

- a 2012 referral based on Mother's mental health and marihuana use while caring for the children;

- a May 2013 referral based on Susan's report that Mother pushed her onto the ground and on medical neglect;

- a July 2013 referral based on Mother's suicide attempt by hanging and the paternal grandmother's drinking while caring for the children; and

- an October 2013 referral based on Mother's and Father's smoking K2 and perhaps marihuana and methamphetamine and the paternal grandmother's drinking while caring for the children.

After Mother's July 2013 suicide attempt, she and Father agreed that she would have only supervised visitation with the children, who would live with Father, and Mother was voluntarily committed to the North Texas State Hospital in Wichita Falls for an extended stay for mental health treatment. After her release from the hospital in the fall of 2013, Mother moved in with her mother (Grandmother), smoked K2 with Father, with whom the children still lived, and began dating Michael Gray.

The family received only family-based social services (FBSS) for the above referrals, although in 2013, the trial court also ordered the parents to participate in services. *See* Tex. Fam. Code Ann. § 264.203. The 2013 FBSS case was closed in August 2014.

## II. Mother Regained Conservatorship of the Children in June 2017 After the 2015 Removal.

In May 2015, the children were formally removed from the parents and placed

in foster care, and TDFPS filed a petition to terminate after receiving a report that Father was selling drugs out of his home, abusing drugs and alcohol, and neglecting the children, and Kellie, the two-year-old, tested positive for methamphetamine and marihuana. Mother substantially completed her court-ordered services, and the trial court placed the children with her full-time on a monitored return in December 2016 and ultimately denied termination and appointed Mother as the sole managing conservator in a final order dated June 15, 2017 (2017 Decree). The 2017 Decree also ordered that Father's possession of or access to the children be supervised. Mother and the children lived with Grandmother, whose probation for possession of methamphetamine ended in late May 2017.

## III. TDFPS Filed a Motion for Termination About Six Weeks After the Signing of the 2017 Decree.

On July 24, 2017, Father's community supervision officer notified TDFPS that Father tested positive for methamphetamine on June 29, 2017, and that Father claimed he had exercised his possession of the children unsupervised, violating the 2017 Decree. TDFPS then visited Mother to check on the children, and Mother tested positive for marihuana and amphetamine and admitted to TDFPS that she had relapsed and used marihuana "weekly for about the past month." TDFPS removed the children again, ultimately placing the girls in one foster home and the boys in another.

After the removal, Father made a delayed report to CPS about Grandmother's

4

injuring Kellie, CPS ultimately notified the police, and an indictment for injury to a child was pending against Grandmother at the time of the 2018 trial.

## IV. The Trial Court Terminated the Parent-Child Relationships in the 2018 Decree.

Following the 2018 trial, the trial court found that Father had executed an unrevoked or irrevocable affidavit of relinquishment of his parental rights, voluntarily relinquishing his rights, and that termination of the parental rights of both Father and Mother was in the children's best interests. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(K), (2). The trial court also found that Mother

- knowingly placed or knowingly allowed the child[ren] to remain in conditions or surroundings which endanger[ed their] physical or emotional well-being . . . ; [and]

- engaged in conduct or knowingly placed the child[ren] with persons who engaged in conduct which endanger[ed their] physical or emotional well-being . . . .

*Id.* § 161.001(b)(1)(D), (E).

## V. The Trial Court Issued Findings of Fact at Mother's Request.

Mother requested findings of fact and conclusions of law after the trial court terminated her parental rights. In addition to the ultimate findings recited above from the 2018 Decree, the trial court's separate findings include the following:

10. The Court finds that the testimony of Karen Lowery, Priscilla Alvarado, [Father], Jacqueline Fox, Dr. Lara Hastings, Abra Piacente, and Rachel Watts to be credible.

11. The Court finds the exhibits offered and admitted to be relevant and applicable, both as to the grounds of termination and to what is in the best interest of the children.

12. The Court finds that [Mother] and [Father] have been involved with the Department in some capacity since July of 2011.

13. The Court finds that [Mother] attempted suicide more than one time while the children were in her care.

14. The Court finds that [Mother] was committed to the Texas State Hospital following a suicide attempt.

15. The Court finds that [Mother] received mental health services from a number of different providers between 2011 and 2015. The Court also reviewed and considered a number of records from some of those mental health providers.

16. The Court finds that [Mother] was absent from her children's lives for a number of years prior to their removal in 2015.

17. The Court finds that [the children] were first removed f[ro]m [Mother] and [Father] in May of 2015.

18. The Court finds that [Mother] and [Father] were offered services from the Department in the 2015 conservatorship case.

19. The Court finds that [Mother] successfully and substantially completed services in the 2015 conservatorship case . . . .

20. The Court finds that [the children] were returned to [Mother] on December 19, 2016 pursuant to a monitored return.

21. The Court finds that [Mother] filed for divorce from [Father] on May 25, 2017. The Court further finds that at the time of trial in September of 2018, [Mother] and [Father] were still married.

22. The Court finds that a final order in the Suit Affecting Parent-Child Relationship was entered on June 15, 201[7].

23. The Court finds that the final order named [Mother] as a joint managing conservator of the children with [Father].[2]

24. The Court finds that the final order named [Mother] as the conservator with the right to designate the children's residence.

25. The Court finds that the final order required that [Father's] possession of the children be supervised at all times.[3]

26. The Court finds that on July 24, 2017, a new referral was received by [TDFPS].

27. The Court finds that upon interview by the Department's investigator in relation to the new referral, [Mother] admitted to smoking marijuana while in possession of the children.

28. The Court finds that [Father] had tested positive for methamphetamine.

29. The Court finds that the Department attempted to place all of the children with caregivers designated by [Mother] to prevent removal but there were no other placement options.

30. The Court finds that one of the people [Mother] offered as a placement option was [Michael Gray], her boyfriend/fiancé[].

31. The Court finds that [Michael Gray] was not willing to be a placement of the children.

32. The Court finds that shortly after the new removal, [Father] notified CASA of Denton County, the children's guardian ad litem, of a photo of a significant bruise on [Kellie].

33. The Court finds that [Susan] and [Kellie] made consistent statements in forensic interviews regarding the cause of the bruise.

---

[2]We note that the 2017 Decree actually named Mother as the children's sole managing conservator.

[3]As noted above, Mother could agree to unsupervised possession by a sober Father.

7

34. The Court finds that the children and [Mother] were residing with [Grandmother] at the time [Kellie] sustained the bruise.

35. The Court finds that [Grandmother] has been indicted for injury to a child in relation to the bruise on [Kellie].

36. The Court finds that [Father] confronted [Mother] about the bruise on [Kellie] and that [Mother] stated she and her fiancé[], [Michael Gray], would "take care of it."

37. The Court finds that [Mother] never made a report to law enforcement or the Department related to the bruise.

38. The Court finds that [Mother] and the children continued to live with [Grandmother] after [Mother] was aware of the bruise and the allegation of who caused the bruise.

39. The Court finds that [Michael Gray] visited with the children less than five times during the pendency of the current case, which had been on file for over a year at the time of trial.

40. The Court finds . . . the evidence and testimony regarding [Mother's] employment history and stability to be contradictory.

41. The Court finds . . . the evidence and testimony regarding [Mother's] support system to be contradictory.

42. The Court finds that [Mother] had not demonstrated stability in her own life nor in providing a stable environment for her children.

43. The Court finds . . . the evidence and testimony regarding [Mother's] suicide attempt and mental health treatment history to be contradictory.

. . . .

[48]. Each fact found above which relates to the final order regarding the parent-child relationship is supported by clear and convincing evidence.

## DISCUSSION

In her first issue, Mother challenges the sufficiency of the evidence of her

conduct between June 15, 2017, the date of the 2017 Decree, and July 27, 2017, the date of the children's removal, to support the endangerment findings. In her second issue, she alternatively challenges the sufficiency of the evidence of her conduct before June 15, 2017, to support the endangerment findings. In her third issue, she challenges the sufficiency of the evidence to support the best-interest finding. Mother raises ineffective assistance of Trial Counsel in all three issues. We address her ineffective-assistance complaints separately from her complaints that the evidence is insufficient to support termination.

## I.    The Evidence Is Sufficient to Support the Termination of Mother's Parental Rights.

### A.    Despite Mother's Res Judicata Affirmative Defense, We May Look Behind the 2017 Decree to Show a Continuing Pattern of Conduct.

Mother argues that we cannot consider evidence before the 2017 Decree in our review because she raised res judicata as an affirmative defense to the current petition to terminate and because in the 2018 Decree, the trial court failed to make the requisite findings under section 161.004 of the Texas Family Code that would allow termination of her parental rights based on her conduct before the 2017 Decree. *See* Tex. R. Civ. P. 94 (including res judicata in list of affirmative defenses); Tex. Fam. Code Ann. § 161.004 (allowing termination based on conduct occurring before a prior denial of termination if there has been a material and substantial change in circumstances and termination is in the child's best interest). TDFPS agrees with her. The parties are partially correct.

9

The trial court could not base its termination of Mother's parental rights on her conduct before the 2017 Decree, but the trial court could consider—as may this court—evidence of Mother's conduct before the 2017 Decree to corroborate evidence of her similar conduct since the decree. *See Wilson v. Elliott*, 96 Tex. 472, 477, 73 S.W. 946, 947 (1903) (holding res judicata "would not preclude the introduction of evidence of conduct previous to the first decree, provided it tended to corroborate the evidence of subsequent conduct of a like nature"); *C.B. v. Tex. Dep't of Family & Protective Servs.*, 440 S.W.3d 756, 766 (Tex. App.—El Paso 2013, no pet.) (stating that "[t]here is one well recognized exception [to the res judicata bar] involving a continuous course of conduct" and illustrating by stating that after an alcoholic parent is named a sole or joint managing conservator, the parent's "behavior before the date of the existing order is properly excluded" but "evidence that the alcoholic's condition is worsening and his or her conduct is impacting the children . . . is relevant to . . . a statutory ground justifying termination [and] . . . also highly relevant to a determination of best interest in . . . termination proceedings").

This court's opinion in *In re K.G.* is distinguishable. 350 S.W.3d 338 (Tex. App.—Fort Worth 2011, pet. denied). In that opinion, this court held that (1) "using section 161.004 is the only way that the trial court could terminate [appellant's] parental rights based upon 'evidence presented at' the hearing before" the denial of the first petition to terminate; (2) the trial court erred by admitting evidence preceding the denial of the first petition because TDFPS did not plead section 161.004 in its

10

second petition; and (3) the error was harmless because "the evidence of constructive abandonment occurring after the [denial of the first petition] was sufficient to support termination." *Id.* at 352 (citations omitted.)  In the analysis of the evidence supporting termination in *K.G.*, however, this court relied on evidence before the denial of the first petition in concluding that "the trial court could have chosen to believe that [appellant's] housing instability and her failure to alter her *pattern of behavior* and take steps to treat her mental health issues demonstrated an inability to provide K.G. with a safe environment." *Id.* at 342, 354–55 (emphasis added) (noting that another child had been born with marihuana in her system before the denial of the first petition; that marihuana had been the mother's drug of choice since she was seventeen, which was several years before the denial of the first petition; and that she had heard voices telling her to hurt Child Protective Services (CPS) when CPS entered her life, which was necessarily before the denial of the first petition).  Thus, our reliance on Mother's pre-2017 Decree behavior to corroborate her post-2017 Decree behavior and to show unchanging patterns of conduct does not run afoul of this court's precedent.

Because we agree with the parties that Mother's pre-2017 Decree conduct cannot be the basis of termination, we dismiss as moot that portion of Mother's second issue alternatively challenging the sufficiency of the pre-2017 Decree evidence to directly support termination.  *See* Tex. R. App. P. 47.1.

In her reply brief, Mother also challenges findings of fact 12 through 20 as barred by res judicata.  We usually do not review issues raised for the first time in a

11

reply brief. *Hulcher Servs., Inc. v. Emmert Indus. Corp.*, No. 02-14-00110-CV, 2016 WL 368180, at *6 n.18 (Tex. App.—Fort Worth Jan. 28, 2016, pet. denied) (mem. op.). To the extent we choose in our discretion to address this challenge, we overrule it for the reasons explained above. *See* Tex. R. App. P. 47.1.

### B. TDFPS Must Prove Its Case by Clear and Convincing Evidence.

For a trial court to terminate a parent–child relationship, TDFPS must prove two elements by clear and convincing evidence: 1) that the parent's actions satisfy one ground listed in family code section 161.001(b)(1); and 2) that termination is in the child's best interest. Tex. Fam. Code Ann. § 161.001(b); *In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *E.N.C.*, 384 S.W.3d at 802.

### C. We Determine Whether the Evidence Is Sufficient to Support Termination Findings.

To determine whether the evidence is legally sufficient to support the trial court's endangerment and best-interest findings, we look at all the evidence in the light most favorable to those findings to determine whether a reasonable factfinder could form a firm belief or conviction that the finding is true. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005); *see* Tex. Fam. Code Ann. § 161.001(b)(2). We assume that the factfinder settled any evidentiary conflicts in favor of its finding if a reasonable

factfinder could have done so. *J.P.B.*, 180 S.W.3d at 573. We disregard all evidence that a reasonable factfinder could have disbelieved, and we consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to the finding if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *See id.*

We must perform "an exacting review of the entire record" in determining the factual sufficiency of the evidence supporting the termination of a parent–child relationship. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). Nevertheless, we give due deference to the factfinder's findings and do not supplant them with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We review the whole record to decide whether a factfinder could reasonably form a firm conviction or belief that Mother endangered the children or placed them in an endangering environment and that termination of the parent–child relationship would be in the children's best interest. Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (2); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If the factfinder reasonably could form such a firm conviction or belief regarding an endangerment ground and the best-interest ground, then the evidence is factually sufficient to support termination. *C.H.*, 89 S.W.3d at 18–19.

### D. We Review Challenged Separate Findings Using the Same Sufficiency Standards.

A trial court's findings of fact have the same force and dignity as a jury's answers to jury questions, and we review the legal and factual sufficiency of the

13

evidence supporting those findings using the same standards that we apply to jury findings. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994); *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991); *see also MBM Fin. Corp. v. Woodlands Operating Co.*, 292 S.W.3d 660, 663 n.3 (Tex. 2009). When the appellate record contains a reporter's record, findings of fact on disputed issues are not conclusive and may be challenged for evidentiary sufficiency. *Super Ventures, Inc. v. Chaudhry*, 501 S.W.3d 121, 126 (Tex. App.—Fort Worth 2016, no pet.). We defer to and are bound by unchallenged fact findings that are supported by some evidence. *Tenaska Energy, Inc. v. Ponderosa Pine Energy, LLC*, 437 S.W.3d 518, 523 (Tex. 2014).

### E. In a Bench Trial, the Trial Court is the Sole Arbiter of the Credibility of the Witnesses.

The factfinder is the sole judge of the witnesses' credibility and demeanor. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009). "It is the classic province of the trier of fact to pass upon the credibility of evidence introduced before it and to accept all, part, or none of it." *In re L.A.F.*, 270 S.W.3d 735, 740 (Tex. App.—Dallas 2008, pet. denied). We therefore overrule Mother's embedded complaints about credibility of the evidence, including but not limited to her challenges to Susan's unfavorable testimony and to the trial court's Finding of Fact 10 finding credible the testimony of various witnesses. *See id.*; *see also In re A.W.*, No. 02-18-00147-CV, 2018 WL 5074770, at *11 (Tex. App.—Fort Worth Oct. 18, 2018, pet. denied) (pointing out that the trial

14

court could believe a parent regarding one topic but disbelieve the parent regarding another topic).

**F.	The Evidence Sufficiently Supports the Endangerment Findings.**

As this court has often discussed,

Endangerment means to expose to loss or injury, to jeopardize. The trial court may order termination of the parent-child relationship if it finds by clear and convincing evidence that the parent has knowingly placed or knowingly allowed the child to remain in conditions or surroundings that endanger the physical or emotional well-being of the child. Under subsection (D), it is necessary to examine evidence related to the environment of the child to determine if the environment was the source of endangerment to the child's physical or emotional well-being. Conduct of a parent in the home can create an environment that endangers the physical and emotional well-being of a child.

The trial court may order termination of the parent-child relationship if it finds by clear and convincing evidence that the parent has engaged in conduct or knowingly placed the child with persons who engaged in conduct that endangers the physical or emotional well-being of the child. Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical or emotional well-being was the direct result of the parent's conduct, including acts, omissions, and failures to act. Termination under subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required.

To support a finding of endangerment, the parent's conduct does not necessarily have to be directed at the child, and the child is not required to suffer injury. The specific danger to the child's well-being may be inferred from parental misconduct alone. . . . [P]arental and caregiver illegal drug use supports the conclusion that the children's surroundings endanger their physical or emotional well-being. . . . As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being.

15

*In re J.W.*, No. 02-08-00211-CV, 2009 WL 806865, at \*4 (Tex. App.—Fort Worth March 26, 2009, no pet.) (mem. op.) (citations and internal quotation marks omitted).

"[E]vidence of abuse of another child, coupled with a present or future danger to the child in question, is relevant to determine whether a parent has engaged in an endangering course of conduct." *In re E.A.W.S.*, No. 2-06-00031-CV, 2006 WL 3525367, at \*10 (Tex. App.—Fort Worth Dec. 7, 2006, pet. denied) (mem. op.); *see also In re R.S.*, No. 02-15-00137-CV, 2015 WL 5770530, at \*6 (Tex. App.— Fort Worth Oct. 1, 2015, no pet.) (mem. op.).

### 1. Mother Smoked Marihuana Within Days of the Entry of the 2017 Decree.

#### a. She Used Marihuana to Cope.

Evidence showed Mother abused marihuana long before the 2017 Decree. The evidence conflicts regarding when she first used marihuana. Nevertheless, she received a cannabis abuse diagnosis as early as 2013.

Mother told the CPS investigator at the time of the July 2017 removal that she had been using marihuana "weekly for about the past month" to combat stress and anxiety and as a coping strategy. She denied using in front of the children. Mother told her TDFPS conservatorship worker that she turned to marihuana to cope because her support system was falling apart.

Mother told the psychologist who completed her September 2017 psychological evaluation that:

16

- Marihuana was her drug of choice;

- Mother historically smoked marihuana when she was stressed;

- Mother had been "clean and sober" for three years after meeting her fiancé Michael in 2013;

- Mother relapsed and used marihuana in June 2017 after losing her job;

- Mother used marihuana after the 2017 Decree because "she was stressed out" about having "to deal with [Father] when he visited the children";

- Michael had not known that Mother was smoking marihuana and was initially angry at her; and

- Mother had no difficulties quitting the habit.

Mother told First Step Denton County Outreach Program, who provided her drug treatment, that she:

- Relapsed three weeks before the July 2017 removal but smoked marihuana only once a week, getting high on "weekends after everyone was asleep";

- "[U]sed it once a week up until July 2017 and for about a month. [She] used it five times during that period";

- "[P]romised to quit using[, but] then [Grandmother] started and [Mother] relapsed";

- Used marihuana because she "was overwhelmed" and "wanted something to calm [her] down";

- Felt powerless to her addiction because she "felt as though [she] had no solid support system" and "was trapped";

- "[H]id [her] abuse from everyone";

- Neglected her children "due to [her] use of . . . drugs"; and

17

- Believes she has a problem with drugs "because [she] uses [marihuana] to cope with stress when [she is] overwhelmed."

Mother also told First Step that her drug use caused the children's removal and the opening of the current CPS case, "brought depression," "[d]rained" her, caused "guilt that was overwhelming," "crushed" her spirit, and depleted her finances.

At trial, Mother testified that she started smoking marihuana again about a week after the 2017 Decree to deal with stress and partially because Father would not sign their divorce decree.

Mother admitted in her testimony that smoking marihuana after the 2017 Decree was detrimental to the children's health and emotional safety, and in Finding of Fact 27, the trial court found that Mother admitted to the CPS investigator that she had smoked marihuana while in possession of the children. In her brief, Mother does not challenge that she smoked marihuana but challenges the finding that she did so while in possession of the children, relying on her statement to the CPS investigator that she did not smoke in front of the children. In the 2017 Decree, Mother was named the children's sole managing conservator. Father's possession was ordered supervised. Mother insisted that Father did not have unsupervised visits with the children after the entry of the 2017 Decree. Thus, the evidence was legally and factually sufficient to support the trial court's inference that Mother was in possession of the children when she smoked marihuana from her statement that she smoked marihuana at night when everyone was sleeping. *Cf. In re K.M.B.*, 91 S.W.3d 18,

25 (Tex. App.—Fort Worth 2002, no pet.) (noting that drug use need not occur in child's presence to be considered endangering behavior). We overrule Mother's embedded challenge to Finding of Fact 27.

### b. Mother Minimizes the Seriousness of Her Usage.

In her brief, Mother tries to minimize the effects of her marihuana use and implies her use was "casual." She also tried to do that during her drug treatment: the clinical impression from her first post-July 2017 removal meeting at First Step—on September 23, 2017—included a statement that Mother "seemed to minimize her frequency and amount of use." But the evidence shows that Mother was not merely a recreational user. *First*, in her plan of care submitted to First Step that day, Mother wrote, "I am an addict to [p]ot. I rela[ps]ed. I went through extreme life changes that put a lot of stress on my shoulders." *Second*, she admitted to First Step on various occasions that her family and friends had complained about her usage. *Third*, the evidence shows that Mother's marihuana use, however limited, affected her thinking. In April 2018, she wrote in her First Step paperwork that the courts set her up for failure. In her testimony at trial several months later, she explained that the paperwork revealed her thoughts when she relapsed in July 2017, not what she thought in April 2018.

Mother's using marihuana to cope continued an endangering pattern of "ineffective coping skills" documented by medical professionals as early as hours after her July 2013 hanging attempt. Mother does not challenge the truth of Finding of

19

Fact 14 that she was committed to the Texas State Hospital following a suicide attempt. Mother conceded at trial that she made one serious suicide attempt. Mother does challenge Finding of Fact 13's assertion that she tried to commit suicide again and that the children were in her care on all occasions that she attempted suicide. Mother's testimony alone is sufficient to show that the children "were there" (albeit not outside with her) when she made the July 2013 suicide attempt. Even though some evidence supports the remainder of the finding, whether Mother attempted suicide sometime other than July 2013 and did so when the children were in her care is not material to our resolution of this appeal. *See Halleman v. Halleman*, 379 S.W.3d 443, 452 (Tex. App.—Fort Worth 2012, no pet.); *Cooke Cnty. Tax Appraisal Dist. v. Teel*, 129 S.W.3d 724, 731 (Tex. App.—Fort Worth 2004, no pet.) (op. on reh'g) (reasoning that immaterial finding of fact is harmless and not grounds for reversal). Accordingly, we overrule Mother's embedded challenge to Finding of Fact 13.

Mother's coping issues continued after her in-patient treatment. In 2015, after a breakup with Michael, the police took Mother to Lewisville MHMR. Mother told MHMR that she was depressed, had suicidal ideations, felt trapped, hopeless, and alone, and did not know what to do to feel better.

Mother's 2017 relapse so soon after the children's return to her was very concerning to TDFPS. It is true, as Mother points out in her brief, that she did not test positive for marihuana again after July 2017, but that does not alleviate the significance of her reasons for using it or of how quickly she resumed using it. The

20

psychologist's summary of Mother's 2017 psychological evaluation shows why Mother's alleged casual use of marihuana was a concern for the trial court:

- Mother "has a history of experiencing mental health problems in connection with coping breakdown";

- Mother "remains vulnerable to struggles to cope when faced with stress and/or anxiety-provoking and distressing circumstances";

- Mother "remains vulnerable to deterioration in her functioning due to ongoing coping deficits"; and

- Mother's "vulnerability to difficulty coping is evidenced in part by her relapse in the use of marijuana when experiencing distress . . . ."

### 2. Mother Failed to Protect the Children from Harm.

#### a. Mother Did Not Report Grandmother's Injuring Kellie or Move with the Children from Grandmother's Apartment.

Father's probation officer reported his drug use to CPS, and Father reported Grandmother's injuring Kellie. Mother did not report either event, repeating some of her pre-2017 Decree misconduct.

Although there is some evidence that Mother reported Father's pre-2017 Decree drug use to the police on some occasions, a former TDFPS supervisor testified that Mother did not report to CPS Father's suspected drug use precipitating the children's 2015 removal, nor did she file a petition to modify custody, which showed a failure to protect on her part. In Mother's 2015 psychological evaluation, the psychologist similarly concluded that Mother "demonstrated compromised judgment and insight" and "[h]er judgment evidence[d] deficits when she state[d] that

21

she had heard from her friends that her estranged husband was using drugs, but she report[ed] no legal action to take custody." Mother even admitted in her 2018 testimony—with excuses—that she did not show good judgment in 2015 when she did not report Father's drug use to TDFPS.

After the 2017 removal, Father told the TDFPS investigator and CASA volunteer that on Father's Day weekend in 2017, while Mother and Michael were supervising Father's visitation with the children, he discovered bruising on Kellie's bottom when he took her to the bathroom. In her forensic interview, Kellie stated that she had an accident and that Grandmother pulled Kellie's pants down, hit Kellie hard with her bare hand, and eventually stopped because Susan was crying. Kellie stated that she told Father the next day and that Grandmother went to talk to him at Michael's workplace.

Mother testified that she "never gave [Grandmother] permission to spank [the] children, but she did it anyways." Evidence conflicted on when Mother knew about Kellie's injuries. Mother testified that she learned when Father told her, and that when she and Father asked about the bruising, Kellie and her older sister Susan both told them that Grandmother had spanked Kellie too hard for defecating in her pants. Father testified that Mother already knew about the beating then but claimed not to have seen the bruises earlier.

Mother initially denied being at home when Grandmother beat Kellie. In Susan's interview, she stated that:

- After Kellie had the accident, she went to Mother in the bedroom, who gave her a swat and told her to go get changed;

- Grandmother then began hitting Kellie too hard in the bathroom, and Susan could hear Kellie screaming in the bathroom from the girls' bedroom;

- Kellie ran and hid with Susan, and Grandmother followed and continued to hit Kellie;

- Mother jumped on the bed to pull Grandmother off Kellie;

- Mother was sad for Kellie; and

- Grandmother and Kellie were both bruised, but Kellie's bruise was bigger.

Mother denied ever swatting Kellie for having an accident, witnessing the beating, and jumping on the bed to pull Grandmother off Kellie. But Mother conceded that she could have been at home but asleep because of her work schedule and indicated that she could have slept through Kellie's screaming. Grandmother testified that Mother was unemployed at the time of the incident.

Regarding the failure to timely report Kellie's injury, Father testified that he had discussed it with Mother and Michael when Father first saw the bruises and that they told him that they would deal with Grandmother and call CPS. Michael testified that he took a picture of the bruises, sent it to Father, and told him to get it handled. However, Michael denied that he took the picture that was admitted into evidence. Mother admitted that she considered calling the police but did not. TDFPS indicated

23

that Mother's failure to report Kellie's bruise to TDFPS showed an inability to be protective of the children.

Mother testified that she did take some protective steps. She testified that she:

- Quit her job after the incident;

- Took the children and stayed with Michael for a few days;

- Returned to Grandmother's apartment after that break because Grandmother was in Colorado for a three-week vacation; and

- Upon Grandmother's return, stayed gone from the apartment with the children when Grandmother was there and awake.

Mother stated that she could not afford to move out and could not live with Michael because he lived with his elderly parents.

Grandmother testified that:

- Grandmother did not travel anywhere in June or July 2017;

- Grandmother did not know if Mother ever temporarily moved out with the children in June 2017;

- Mother had not worked since she and Michael decided to buy a house together, so Grandmother was working fourteen to sixteen hours a day to pay the bills;

- Grandmother would not have been a danger to the children because she was "hardly ever there"; and

- Mother had accused her of spanking Kellie.

Susan indicated in her interview that after Kellie's injury, Mother had told Grandmother not to spank the children anymore, but Susan had been spanked on a later occasion by one of the women in the other's presence; Susan's language did not

24

clarify which. Regardless, Susan's statement indicates that after Kellie's beating, Mother and the children were still around Grandmother when she was awake.

### b. Mother Did Not Report Grandmother's Drug Use or Move Before the 2017 Removal.

Mother continued her trend of bad judgment by not reporting Grandmother's 2017 drug use. Although in her testimony, Grandmother denied all drug use since 2009 and specifically denied smoking marihuana in June or July 2017, Mother testified that a week or two after Grandmother's probation ended in late May 2017, Grandmother began a "downward spiral" and started using drugs again, but only marihuana, not methamphetamine. However, Mother did not report Grandmother's relapse to anyone before the 2017 removal nor move with the children out of Grandmother's home. It is worth noting that a week or two after a date in late May 2017 would have been before the trial judge signed the 2017 Decree naming Mother the children's sole managing conservator, which TDFPS supported despite knowing Grandmother's criminal and drug history because TDFPS understood that she had been drug-free for years.

### 3. The Post-2017 Decree Evidence Sufficiently Supports the Endangerment Findings.

Mother testified that she felt terrible because she "hurt" the children. A former TDFPS supervisor testified that Mother had "engaged in a persistent pattern of endangering her children" for several years, and after the 2017 Decree, she similarly

25

endangered the children through her conduct or knowingly allowed them to be with others who engaged in endangering conduct:

> [Mother] knowingly engaged in the conduct by using [an] illegal substance while she was caring for her children. She knowingly allowed her children to be in the care of somebody who physically abused [Kellie]. She . . . did not demonstrate a sense of protectiveness for her children with allowing [Grandmother] to have continuing contact with her children after the physical abuse had occurred.

We agree. Accordingly, applying the appropriate standards of review, see *J.P.B.*, 180 S.W.3d at 573 (providing legal-sufficiency standard of review); *C.H.*, 89 S.W.3d at 18–19, 28 (providing factual-sufficiency standard of review), we hold that the post-2017 Decree evidence is legally and factually sufficient to support the trial court's endangerment findings, and we overrule this portion of Mother's first issue. To the extent Mother's second issue encompasses a challenge to the adequacy of the pre-2017 Decree endangerment evidence to corroborate the post-2017 Decree endangerment evidence upon which we uphold the endangerment findings, we also overrule that portion of her second issue.

### G.    The Evidence Sufficiently Supports the Best-Interest Finding.

In her third issue, Mother contends that the evidence is legally and factually insufficient to support the trial court's best-interest finding. In determining whether evidence is sufficient to support a best-interest finding, we review the entire record. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). Although we generally presume that keeping a child with a parent is in the child's best interest, *In re R.R.*, 209 S.W.3d 112,

26

116 (Tex. 2006), the best-interest analysis is child-centered, focusing on the child's well-being, safety, and development, *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018).

Evidence probative of a child's best interest may be the same evidence that is probative of a subsection (1) ground. *E.C.R.*, 402 S.W.3d at 249; *C.H.*, 89 S.W.3d at 28. We also consider the evidence in light of nonexclusive factors that the trier of fact may apply in determining the child's best interest:

(A)    the child's desires;

(B)    the child's emotional and physical needs, now and in the future;

(C)    the emotional and physical danger to the child now and in the future;

(D)    the parental abilities of the individuals seeking custody;

(E)    the programs available to assist these individuals to promote the child's best interest;

(F)    the plans for the child by these individuals or by the agency seeking custody;

(G)    the stability of the home or proposed placement;

(H)    the parent's acts or omissions indicating that the existing parent–child relationship is not a proper one; and

(I)    any excuse for the parent's acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best-interest finding, "we consider, among other evidence, the *Holley* factors" (footnote omitted)); *E.N.C.*, 384 S.W.3d at 807. These factors are not exhaustive, and some listed factors may not apply to some cases. *C.H.*,

89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient to support a finding that termination is in the child's best interest. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

### 1. The Dangers Associated with a Return to Mother Justified Termination.

The most compelling evidence of the children's best interests is the evidence proving endangerment. Since the 2017 Decree, Mother exposed the children to danger and instability through her choices, such as using drugs to cope, not reporting Father's drug use to the police or CPS, not reporting Grandmother to the police, and not leaving Grandmother's home permanently.

The most critical factor appears to be Mother's inability to cope. Her 2017 psychological report provides that "the extent to which [Mother] would have the coping resources, strength, and skills to provide and care for her children on her own is unclear." Mother turned to marihuana to cope soon after the four children were placed in her care. TDFPS was particularly concerned that Mother did not have a sponsor when she relapsed before the July 2017 removal and did not have a sponsor at trial, which was required by both her service plan and drug treatment. A sponsor is "part of recovery. You need that ongoing support piece, somebody who's walked in those shoes and . . . understands the steps of recovery, and that person then guides the recovering person into full-on recovery" past the TDFPS case and past drug

28

treatment. TDFPS indicated that a sponsor is critical to recovery and the prevention of relapse. None of Mother's testimony alleviated any of TDFPS's concerns that Mother would go back to using drugs when another stressful event occurred: "It is very concerning that four children would create a significant stress due to [Mother] not being a long-term parent, and that could . . . cause a high probability of relapsing, and she doesn't have a sponsor to lean on if she was experiencing a moment of wanting to relapse."

The trial court also heard evidence upon which it could determine the children faced other future endangerment risks if returned to Mother. Mother testified that she had distanced herself from Grandmother and was "living in a completely different zip code and everything," and Grandmother testified that while they communicated daily, it was only on Facebook with no more "deep conversations," but at the time of trial, they both lived in Ponder, Texas. We judicially notice that Ponder has one zip code. *See* Tex. R. Evid. 201; United States Postal Service, https://tools.usps.com/zip-code-lookup.htm?bycitystate (last visited March 22, 2019).

Further, Mother told the CASA volunteer and TDFPS that Michael pushed her once earlier in their relationship. Mother testified that pushing is not the same as an assault and that Michael was just moving her out of the way. While Michael denied any violence, Mother's view of violence, given the injury to Kellie and Mother's failure to report it, is concerning.

Finally, as her 2017 psychological evaluation indicated, Mother "appear[ed] prone to some extent to dependency, whether emotionally on her fiancé, or financially and for housing on her fiancé or her mother." The house Mother lived in with Michael was in his name. In fact, TDFPS had "major concerns that [Mother's and Michael's] lives together seem[ed] to be all under [his] name." Mother worked for "just extra spending money" and potential future medical benefits and relied on Michael to pay the bills. Thus, Mother was

> engaged, in . . . what appear[ed] to be a committed relationship with somebody who she[ was] dependent on for her financial well-being, and she [was] still not divorced from [Father]. So it le[ft] a little bit of uncertainty for the children, that even in her commitment with [Michael], it[ was] not necessarily the most stable environment for the children.

### 2. The Children's Needs and Their Futures Offered by a Return to Mother or Adoption Weigh in Favor of Termination.

### a. The Children Need a Safe, Stable Environment.

The evidence of with whom the children wanted to live was weak, although the CASA volunteer testified that Susan, the oldest child at almost eleven years old, wanted permanence and stability and was open to being adopted. All the children were aware that adoption was a possibility.

Mother correctly indicates in her brief that the children's interviews at the time of the July 2017 removal show affection and a bond with her. However, while we agree with Mother that Finding of Fact 16 stating that she had been absent from their

30

lives for a number of years is overstated, the evidence shows that the children had gone long periods without living with her. Mother admitted in her testimony that she had not independently parented since 2012. From her July 2013 suicide attempt until the children's 2015 removal, the children lived with Father, although Mother testified that the children went back and forth between Father and her. From their 2015 removal until their December 2016 monitored return to Mother, the children were in foster care, and by July 2017, they were back in foster care. Thus, Kellie, as the youngest, had lived in foster care longer than she had lived with Mother.

The boys were in one foster home, and the girls were in another foster home; the four children saw each other weekly. Susan suffers from ADHD, and was behind academically at the time of the July 2017 removal, although she had been on target when returned to Mother in December 2016. That Susan was behind academically after being in Mother's care only months was very concerning to TDFPS because it "demonstrate[d] that [Mother] was potentially not working with the[ children] educationally while they were in her care." Susan almost failed the 2017-2018 school year. The foster mother also reported to the psychologist that Susan lied a lot. Nevertheless, the psychologist concluded that she was adjusting well to her foster care placement.

Timothy seemed excited to see his parents at visits and was flourishing in his foster placement with his brother. He had no problems socially, although he sometimes threw fits, crying for five minutes. Mother testified that she knew he had

31

been dealing with anger issues, "[p]robably because he[ was] angry at the whole situation."

Mother testified that Asa was gifted but socially awkward. After the removal, he was both bedwetting and defecating himself several times a week, which acts Mother admitted were probably happening because of the trauma of the removal for which she was responsible. His psychological evaluation indicates that he had "dysregulated emotions," including periods of sadness and crying, and that he was occasionally noncompliant after a family visit.

Kellie's only problem at the time of her October 2017 psychological evaluation was that she was still not toilet-trained.

Mother testified that to ensure the children would not be removed by TDFPS a third time, she would "[b]e in a better environment, surround them [with] people that are completely normal and sober, and have a family unit that they can trust." TDFPS wanted the children to have "[p]ermanency, stability, and a safe environment where they[ would be] free from abuse, neglect, [and] illegal substances."

### b. Mother's Plan Is Not Solid Enough to Justify Returning the Children to Her.

The evidence shows that Mother cared about the children and was concerned about the struggles they had to overcome in foster care. She thought about their future together as a family and the opportunities available to them if they were placed with her. Mother's plan, however, was still fraught with uncertainty.

Though Mother had completed TDFPS services more than once, TDFPS was concerned "[t]hat [Mother] ha[d] not demonstrated a change in behavior. She'[d] gone through her services multiple times and [was] still exhibiting the same behaviors that ha[d] resulted in the children coming into care multiple times, as well as being exposed to illegal substances and abuse." The CASA volunteer similarly testified that in the three years she had been involved in the case, Mother had not demonstrated

- A significant change in her behavior;

- Increased parenting skills;

- Responsibility for the removal; or

- Parenting skills to deal with Asa's accidents.

TDFPS's position at trial was that termination was in the children's best interest because Mother

> had ongoing patterns of behavior that did not seem to be alleviated with the services [it] had offered, really since 2011. [TDFPS] felt . . . the children had spent a significant amount of time in foster care, away from . . . [M]other . . . , and with the patterns not changing, [TDFPS] had the concern the patterns would continue . . . .

At trial, Mother and Michael had been back together about a year and a half since their last breakup. They were engaged, but she was still married to Father, and at the time of the termination trial, her pending divorce was on the dismissal docket. Mother had moved to Ponder with Michael, in a house large enough to accommodate the children, but the house was in his name, not hers. Michael and Mother both

claimed that he wanted to adopt the children, and Mother testified that he loved the children, but despite dating Mother off and on for several years:

- Michael refused to serve as a fictive kin placement after the July 2017 removal;

- Michael never spent more than a day at a time with the children;

- Michael got confused about the twins;

- Michael saw the children only three to five times from their July 2017 removal until the 2018 trial;

- Michael did not have a relationship with them during that time; and

- Michael did not complete services despite being advised by TDFPS and the CASA volunteer to do so.

### c. TDFPS's Plan Appears to Offer Safety and Stability.

TDFPS wanted the children to be adopted by a nonrelative. TDFPS testified that a "potential adoptive home"—neither a relative nor fictive kin—wanted all four children, had maintained contact with TDFPS, and was awaiting the trial's resolution before moving forward. The CASA volunteer testified that she had participated in selecting a permanent placement and had reviewed the home study of the family seeking placement of the four children.

TDFPS testified why adoption would be better for the children than another return to Mother:

> [The adoptive home] would be a home that would be loving, stable, able to provide for all of [the children's] needs, both physically, financially, educationally. They would be able to provide long term for any therapeutic needs, medical, dental. It would provide a home that

34

had all four children, that were not moving from place to place to place. There's no potential of financial instability. There's no potential of a relationship breaking down and, therefore, the home breaking down. So an adoptive home would be in the best interest for the children.

### 3. We Uphold the Best-Interest Finding Against Mother.

Having reviewed all the evidence according to the appropriate standards of review, *see J.P.B.*, 180 S.W.3d at 573 (providing legal-sufficiency standard of review); *C.H.*, 89 S.W.3d at 18–19, 28 (providing factual-sufficiency standard of review), we hold that the post-2017 Decree evidence is legally and factually sufficient to support the trial court's best-interest finding, and we overrule this portion of Mother's third issue.

## II. Mother Did Not Prove That Trial Counsel Was Ineffective.

In the remaining portions of her three issues, Mother contends that Trial Counsel provided ineffective assistance.

### A. We Apply the *Strickland* Standard, Not the *Cronic* Standard.

Indigent parents have a statutory right to counsel in TDFPS-filed parental termination cases. Tex. Fam. Code Ann. § 107.013(a). That right to counsel includes the right to effective assistance of counsel. *In re M.S.*, 115 S.W.3d 534, 544 (Tex. 2003). To satisfy her burden of proving that Trial Counsel was ineffective, Mother must show (1) that Trial Counsel failed to perform in a reasonably effective manner and (2) that "the deficient performance prejudiced [her case], which requires showing that counsel's errors were so serious as to deprive [Mother] of a fair trial, a trial whose

35

result is reliable." *H.R.M.*, 209 S.W.3d at 111 (internal quotation marks and citation omitted); *see Strickland v. Washington*, 466 U.S. 668, 687–88, 104 S. Ct. 2052, 2064 (1984).

Citing *United States v. Cronic*, 466 U.S. 648, 104 S. Ct. 2039 (1984), Mother contends that Trial Counsel's failures amount to a failure to provide any adversarial testing of TDFPS's or the children's attorney ad litem's cases. We disagree. Under *Cronic*, if an appellant can demonstrate that appointed counsel "entirely fail(ed) to subject the prosecution's case to meaningful adversarial testing," so that there was a constructive denial of the assistance of counsel altogether, then prejudice, because it is "so likely," is legally presumed. *Id.* at 658–659, 104 S. Ct. at 2046–47. But appointed counsel's failure to test the prosecution's case must be "complete" before prejudice is presumed. *Bell v. Cone*, 535 U.S. 685, 696–697, 122 S. Ct. 1843, 1851 (2002); *see also Strickland*, 466 U.S. at 692, 104 S. Ct. at 2067 ("[C]onstructive denial of the assistance of counsel *altogether* is legally presumed to result in prejudice") (emphasis added). In other words, the standards distinguish between "shoddy representation" and "no defense at all." *Childress v. Johnson*, 103 F.3d 1221, 1229 (5th Cir. 1997). "[B]ad lawyering, regardless of *how* bad, does not" justify applying *Cronic*. *Id.* (quoting *McInerney v. Puckett*, 919 F.2d 350, 353 (5th Cir. 1990)). Accordingly, prejudice will be presumed only when the accused "can establish that counsel was not merely incompetent but inert." *Id.* at 1228.

Mother contends Trial Counsel was ineffective because she requested and was granted a continuance to review TDFPS's evidence, failed to watch the forensic videos of Susan and Kellie until the week before trial; failed to read before trial the business records offered by TDFPS and admitted into evidence by the trial court; failed to challenge the CASA volunteer's report and the forensic interviewer's testimony about Susan and Kellie's videotaped interviews; failed to show Mother the videotaped interviews before they were admitted at trial; and failed to raise Susan's propensity for lying. Our review of the record reveals that Trial Counsel cross-examined almost all of TDFPS's witnesses, offered a witness on Mother's behalf, offered exhibits into evidence, objected to other evidence, and delivered an appropriate closing argument focused on Mother's recent progress and the children's best interests. Thus, Mother does not complain of inert counsel. We therefore decline to apply *Cronic* to this case. *See In re G.H., Jr.*, No. 12-16-00327-CV, 2017 WL 2464694, at *3–4 (Tex. App.—Tyler June 7, 2017, pet. denied) (mem. op.); *In re D.L.*, No. 12-16-00159-CV, 2016 WL 6876503, at *3 (Tex. App.—Tyler Nov. 22, 2016, no pet.) (mem. op.); *In re M.A.B.*, No. 01-15-00388-CV, 2015 WL 6081937, at *10 (Tex. App.—Houston [1st Dist.] Oct. 15, 2015, pet. denied) (mem. op.).

## B. Mother Cannot Show Trial Counsel's Performance Prejudiced the Trial's Outcome.

Our review of the record indicates that the trial court gave Trial Counsel a continuance as well as time during the trial to review TDFPS's extensive documentary

evidence, and TDFPS and Trial Counsel ultimately agreed on redactions to some of the records. The trial court as factfinder saw the admitted videos, admitted the psychological evaluations of the children, and therefore presumably noticed, as this court did, that Kellie did not state whether Mother was present when Grandmother beat her and that the foster mother claimed Susan often lied.

Even if the trial court did not and Trial Counsel's performance was defective, Mother cannot show that the performance prejudiced the outcome of her trial. *See M.S.*, 115 S.W.3d at 550; *In the Interest of A.C.*, No. 02-18-00129-CV, 2018 WL 5273931, at *9 (Tex. App.—Fort Worth Oct. 24, 2018, pet. denied) (mem. op.). The undisputed evidence clearly and convincingly shows that Mother returned to her drug of choice a week after the 2017 Decree, that she never reported Kellie's beating to the authorities, and that the life she offered the children if they were returned to her again depended on her permanently maintaining a relationship with a man who had barely seen the children after the July 2017 removal.

Finally, to the extent that Mother also complains of the children's attorney ad litem's performance, she has no standing to do so. *See Torrington Co. v. Stutzman*, 46 S.W.3d 829, 843 (Tex. 2000); *J.R. v. Tex. Dep't of Family & Protective Servs.*, No. 03-15-00108-CV, 2015 WL 4603943, at *3 (Tex. App.—Austin July 30, 2015, pet. denied) (mem. op.); *In re T.N.*, 142 S.W.3d 522, 524 (Tex. App.—Fort Worth 2004, no pet.).

We therefore overrule the remaining portions of Mother's three issues.

## <u>CONCLUSION</u>

Having overruled Mother's three issues, we affirm the trial court's judgment.


Per Curiam

Delivered:  March 28, 2019